May it please the court. My name is Sean Bailey. I represent the heirs in the state of Crystal Bannister. With your permission, I'll address municipal liability issues first and then turn to the individual liability issues. Crystal Bannister committed suicide in the Caribou County jail on August 25, 2009. In the years leading up to that day, Caribou County received a series of stern warnings that its jail was chronically understaffed, that it could not properly rely on dispatchers to monitor inmates, and that these staffing and monitoring policies posed a serious risk to inmates like Crystal. Caribou County ignored these warnings, and these deficiencies caused Crystal's death. When you say they got these warnings, is that from some kind of sheriff's association report or something like that? Yes, Your Honor. There were two things. There were a series of inspection reports and letters from the Idaho Sheriff's Association, and there was also a report from a consulting company called Rocky Mountain Corrections that is run by former Idaho sheriffs and experienced individuals who run jails in Idaho. So what these deficiencies meant was that when Crystal died, there was only one detention deputy in the entire jail, and there was also a dispatcher in the jail, also in Crystal's entire time in the jail. But the fact that there was a deficiency is not the end of it. In other words, is there anything in the record to show that whatever the governing body of the county is, or the policy-making body, what that body did, whether they saw those reports, and if they did, what they did in response to them? Well, Your Honor, it is undisputed that the county commission received those reports and that they took no action in response to them. The staffing and monitoring issues or policies continued the same as they had before those notices were received. So when Crystal passed away, there was only one detention deputy and a dispatcher in the jail, and during her entire time in the jail, there was no and repeatedly asking for medical attention. There was no one there qualified to help her, and there was insufficient staff to notice when she started attempting suicide and continued for an extended period and was ultimately successful. Now, how does that fit in with your claim of municipal liability? Are you saying it was the policy of the And the proof is what? Just the fact that that's what happened? Well, Your Honor, the Caribou County Jail is a regional jail, in effect. It houses inmates both from Caribou County and from surrounding counties, and they had a long-standing policy. I hate to say it, but I don't even know exactly where Caribou County is. What part of the state is it? It's in southeast Idaho, Your Honor. Southeast. So that's east of Pocatello? It's roughly northeast of Pocatello. And it's a regional jail for several counties Yes, Your Honor. And the county seemed to put the profits it generated by operating this jail over inmate safety. It had a long-standing process of operating the jail with only one detention deputy to watch over as many as 50 or more inmates. How do you distinguish this case from the Clouthier and Simmons cases? Yes, Your Honor. I wouldn't say that we distinguish it. Clouthier and Simmons applied the test established by Farmer v. Brennan. There's an objective and a subjective component, and this really goes into individual liability. The part of the test that we're focusing on in this case is that on the individual liability side, Mr. Downs and Ms. Long, the only two jail staff present when Crystal passed away, had to have subjective knowledge of her heightened suicide risk. And we have the evidence to pass that test. Mr. Downs and Ms. Long both knew that Crystal was actively suicidal. They knew she had attempted suicide less than 48 hours earlier, that she was hospitalized related to that attempt, and in the case of Ms. Long, she believed Crystal was on suicide watch due to that attempt and hospitalization. Second, both of them observed Crystal's condition deteriorating. They saw her in her cell, sobbing, shaking uncontrollably, repeatedly kicking her cell door, and repeatedly asking for medical attention to see a doctor or a counselor or to be taken to the hospital. Third, and most importantly, both Mr. Downs and Ms. Long heard Crystal's statements or became aware of Crystal's statements that she intended to commit suicide. That's extremely important. There were three suicidal statements. Well, you know, if those people were there and observed all this and could have done something, isn't that almost evidence that it was not understaffed? There were, you know, personnel there to observe and monitor and report what happened? No, Your Honor. I believe that we have more than enough evidence for a jury trial on both individual liability and municipal liability. The causation facts, I think, is what that goes to on municipal liability, and there's a few ways that we satisfy the causation element. First, and pretty remarkably for these kind of cases, shortly after Crystal's death, Sheriff Anderson admitted in a conversation with a reporter, one, that the jail was, quote, undermanned, and two, that the jail's dispatchers were too busy doing other things to monitor inmates. Let me ask you, we have to look at this from a subjective, I think, awareness of serious risk of harm and the evidence of that, and I think both the officers here knew that she was withdrawing from drugs and drug use, and so that behavior that they saw was consistent with that, and there was a medical release by the hospital. There was a medical release by a doctor at the hospital where she had been, I guess, earlier that day or the day before. I know the district court put a lot of emphasis on the medical release. Saying that that communicated to the officers that she was mentally and physically able to be released from the hospital, so how do you address that? Yes, Your Honor. The trial court ruled that this fax received by the jail at about noon on August 25, 2009 is an insurmountable obstacle to the banister's individual liability case. There are three significant flaws with that conclusion. Number one, Mr. Downs and Ms. Long did not read the fax. They didn't know what it said. In the case of Ms. Long, there's no evidence that she even knew it existed. The fax was received by the jail and promptly placed in the jail medical folder. Mr. Downs testified he didn't look in the jail medical folder and read the documents there, and there was also testimony that dispatchers like Ms. Long had no access to that file. The second flaw in that conclusion is that the fax was received by the jail at about noon. Crystal didn't pass away until about 8 p.m. In that time frame between noon and 8 p.m., things happened that told Mr. Downs and Ms. Long that Crystal was actively suicidal. Most notably, the jail noted in its medical history that Crystal was suicidal in that time frame. Mr. Downs and Ms. Long observed Crystal deteriorating. They saw her sobbing, shaking uncontrollably. Kicking her cell door and asking for medical attention repeatedly. The third, and also in that time frame, lest I forget, they heard her statements and became aware of her statements that she intended to commit suicide during that time frame. The third flaw with the conclusion that the fax is an insurmountable obstacle is the text of the fax itself. This is the fax. It consists of three pages. The first page is a fax cover sheet. The last page is a prescription. The second page is a short note written by Dr. Trevor Robinson that reads, To whom it is concerned, Crystal Bannister has been medically cleared and released from the hospital. She was evaluated by Sean Tobler and myself and found to be mentally and medically stable. If she is incarcerated, I would recommend that she take the following medications to avoid withdrawal. He lists the medications and dosages, methadone, Xanax, Lexapro, and concludes, if I can be of assistance, please call my office. Now, please notice that this fax says nothing about Crystal's present condition when she arrived at the jail. It exclusively concerned an evaluation done at a different place, at a different time, under different circumstances. It says nothing that would justify the jail and Mr. Downs and Ms. Long in ignoring Crystal and doing nothing. If we, the two pieces of your case, do they not go on different tracks? That is, if we were to agree with you that there are issues of fact regarding individual liability, we don't necessarily have to agree with you that there are issues of fact on the Monell claim. Is that true? That's correct, Your Honor. They are independent of each other. And that was a flaw in the trial court's ruling is that he didn't even analyze the municipal claims. He concluded that in light of his ruling on the individual liability claims, he didn't need to reach that. But the Ninth Circuit... You can have municipal liability without individual liability. But you can also have individual without municipal. Okay. But here, the reason Judge Wendell didn't reach municipal liability is because this is the kind of case where, you know, the municipal liability is really predicated or tied to, you know, the same ground as individual liability. And he said since there's no basis for individual liability to him, that would automatically preclude Monell liability, right? Well, no. Well, all I'm saying, I mean, that's his view. I mean, he didn't separately analyze Monell liability is what I'm saying. He never really looked at it. That's right, Your Honor. And it was error to do so, particularly because in this circuit's understaffing cases, that's Cabrales in a recent case. No, what I'm getting at is this. Suppose we... I'll say, I'll speak hypothetically. Suppose we agree with you that, yes, there are controverted facts with respect to individual liability of the two officers. So we would reverse on that. Are we then required to independently review the record to see whether there is a basis for Monell liability? Or does the result on the, you know, Monell claim follow from our determination of the individual claims? Your Honor, they should be evaluated separately, particularly given the facts of this case and the way that understaffing cases frequently work. And the reason for that is there are understaffing cases out there that say this was a systemic problem. The jail knowingly failed to staff this facility. And therefore, those few individuals who were there, who were basically helpless, they couldn't possibly do everything that needed to be done, may not be individually liable. But the jail knew it was understaffing this facility, and it is liable under a Monell theory. In other words, it's your position that, say, even if we conclude that the individuals shouldn't be held liable for whatever reason, I'll just say hypothetically, you know, for instance, they have qualified immunity, which is not an issue in this case, but we would still have to independently evaluate whether or not there's a Monell liability. All right. Yes, Your Honor. I just want to get your position clear. Thank you. Thank you, Your Honor. I'd like to reserve the remainder of my time. You may do that, Mr. Bailey. Thank you. May it please the Court, Counsel, my name is Curt Lund-Naylor. I represent Caribou County, located in a very rural area of southeastern Idaho, where Soda Springs is, Your Honors. First of all, just to clarify, I believe that the Heller case and the Simmons case pointed out that if there is no individual liability, then there cannot be any Monell municipal violation for the reason that if there is no constitutional violation, then there cannot be an unconstitutional custom practice or policy by the county. But it doesn't work the other way. If we were to hold that there's an issue of fact as to the individuals, it might or might not mean there's an issue of fact on municipal liability. That is correct. Okay. Why isn't this case more like Kahn than any of the other cases that have been discussed so far? Well, first of all, Kahn is not precedential at this point because it's been reversed by the U.S. Supreme Court. But factually, it is also distinguishable, as we point out in our brief, because in that case you had, as I recall, there were significant delays and there had been six suicides in that jail previously that put the jail on notice of its conduct. In this case, there has not been, in the record, there's no prior suicide at Caribou County Jail. What difference does that make? So the jailers get a free death without liability, no matter how egregious the circumstances? Is that the rule? No, Your Honor. But I'm just distinguishing the difference between Kahn and some of the egregious factors that were discussed by the court, the majority court, in that particular case. However, I think the prevailing and controlling law in the Ninth Circuit is the Simmons and Clothier case, where the language is very specific that there has to be an acute suicide risk, an immediate risk. It sure looks like it in this case, at least that there's an issue of fact. Because, remember, this is on summary judgment, and, of course, we can't possibly know how a trier of fact would ultimately look at this. But we have someone who is in just dreadful condition, very obviously so, when she is in the jail. And let me, Your Honor, you raise an important distinction. While her conduct or her demeanor was emotional, there's no indication that it was suicidal. In fact, even Dr. Robinson's letter states that if she's incarcerated, and it's clear in the record that Dr. Robinson knew that she was going to be incarcerated, the whole purpose for him being contacted by the city police was to get this release because Deputy Bradyhoff would not allow her to be booked into the jail without a release. I guess I'm really confused about one thing. I thought it was made clear, at least to Downs, that she was not strong enough to be in jail and that she would kill herself. Did he not know that? No. The only, what Plaintiff's Counsel has relied on in its briefing is the testimony of Robert Bannister, the father, who had a conversation with Ms. Bannister, where he testifies that she said, I'm suicidal, I'm going to kill myself. And he heard, at the end of that conversation, somebody say, I need to take the cell phone back. There's no evidence that any actual person heard that part of the conversation, but what's telling is that Bannister didn't do anything about that. Well, you can draw an inference. You can draw an inference, can't you? Not unless there's direct or even circumstantial evidence that that... That is circumstantial evidence. You can hear somebody's voice over the phone. They're standing close enough to hear the conversation. You can draw an inference. I'm not saying it's a fact, but... Your Honor, I agree with, at that moment of the conversation, but there's no evidence that that jailer or that male person was nearby at the time in the earlier part of the conversation. You can draw the inference that the person was nearby, and you can draw the inference that it was a jailer, because, you know, persons allowed around the prisoner in a jail are very restricted, right? So we can draw the inference. I'm not saying it's a fact, but, you know, it doesn't have to be, you know, beyond a reasonable doubt. It's just an inference that can be drawn. This is summary judgment. Well, that's... You're making a jury argument. No, Your Honor. Well, Your Honor, I appreciate that, but... Well, at this stage, though, too, isn't... I mean, we have to draw all the reasonable inferences in the light most favorable to the plaintiff, do we not? Yes. Yes. And a reasonable inference from the release from Dr. Robinson was that he was concerned about her withdrawal, not suicidal, and that the risks have to be so imminent that no reasonable person would be otherwise able to conclude otherwise. In this particular case, the individuals were reasonable under the circumstances, and, in fact, it's clear that even as you look at the specific conduct by Deputy Downs, he allowed her to have the cell phone. She had heard her say something about she wanted to watch TV. And he also heard her say that she didn't want to survive like this, didn't he? In that... Yes, he reported that she said that. And Long believed that she was on suicide watch because of her bizarre behavior and her freaking out. One of them said... I don't remember who said that phrase, but... Long made that originally in her statement, but even within 45 minutes of her interview, she clarified that she had just assumed... Right, but the reason she assumed it was because the person involved was in such terrible mental condition. It wasn't a mental condition. In fact, she wasn't even in withdrawal at that point based upon the testimony of three medical experts that went unrebutted in the record. But if she assumed, then doesn't that bear directly on her subjective awareness? I mean, if she assumed she was suicidal, then, you know, her subjective awareness was that she was suicidal, that Ms. Bannister was suicidal. I don't know that that... The fact that she assumes it, I don't know if that helps you a lot. I'm curious if the panel decides that summary judgment was not appropriate for Mr. Downs and Ms. Long, should the court analyze the Monell sufficiency of the evidence or do we send it back to the district court judge to do that? I think that this court can review the motion for summary judgment de novo, so it depends on how this court wants to approach it. But I believe that either way, I don't know that there's a guiding principle in this case law. And on Monell, and so is it your position that the one detention deputy and the dispatcher on duty was enough, especially in light of these reports that had been issued based on how the jail operated? Well, let me clarify for the record, first of all, counsel's statement that it is undisputed that the county received these reports. It is not undisputed because the Rocky Mountain corrections report, there's nothing in the record that indicates that the county actually received that report. The person deposed from Rocky Mountain was not the author, did not participate in the report. He was simply advised about the report. But there is no evidence that the sheriff, who at that time was the prior sheriff in 2006, not the current sheriff in 2009, that the sheriff or the county commissioners received it, nor is there any evidence in the record, nothing in the record, concerning what, if anything, if they did receive it, the county acted on. So it is, the court cannot rely on the conclusions drawn from the Rocky Mountain corrections report. Well, what about the, they did receive the Sheriff's Association report, right? Yes, and the Sheriff's Association report, if you read that, it doesn't talk about suiciding as suicide. It deals with officer safety because if there's an emergency that occurs in the jail, the dispatcher cannot leave her post and that detention will not have immediate assistance available. So, in other words, if an officer needs to go into a jail cell, there has to be two officers, and for that to occur, you'd have to have two. Well, the letter certainly alerts them that they're understaffed, and the question I guess you're raising is whether there's a connection between the notification that they were understaffed and the danger of suicide by a person within the jail, and that's what you're saying is missing? And there's no evidence in the record, even at the motion for summary judgment level. We have Dr. Kennedy's report that testifies just contrary, but there is nothing in the record. The report from the Idaho Sheriff's Association also talks to you should have, but there's also evidence in the record that this jail was certified by that same association in compliance with all the standards through that period of time. So, there's no evidence of any violation of any standard or protocol for the jails at that point in time as well. There was a private consulting company. I want to make sure I understand, or I'm not going to. It's the Rocky Mountain. Okay. And they inspected the jail in 2006? Correct. And while the company was at the jail for inspection, this is the one where they were there and an inmate attempted to commit suicide while they were there, correct? Correct. And the company, I thought, had communicated to the sheriff's office in 2006 that if an inmate attempted suicide, the attempt may be successful before staff can respond because of being elsewhere in the facility and not having any assistance. And if we had not been in the control room at the time, it is very probable from the location of the dispatcher that she would not have seen the incident on the monitor. Doesn't that create a sufficient tribal issue that the county was put on notice? Yes, Your Honor. Especially in light of what happened here that the dispatcher didn't see what was happening? I understand exactly. However, as I pointed out earlier, there is no evidence that that actual report was received by the county. It was written by Rocky Mountain Corrections, but the document itself was obtained from Rocky Mountain. We did not obtain it from the county. In fact — So there was no discussion about — there's no evidence of that being discussed at the time because apparently there were a lot of alarms being set off at the time when that happened. There's no evidence in the record that the county ever received it, the commissioners ever considered it, the sheriff took any action or even received it. In SR 6, which is the discovery response, it was clearly made there that this document was produced to counsel for Caribou County defendants by Rocky Mountain Corrections. We received it from Rocky Mountain on or about January 4th and produced it just prior to the deposition of that entity. You say — I think Judge Graber asked you about Kahn, and I was curious to see how you distinguish this case from Kahn, and I think your response was that it was reversed by the Supreme Court. Is that what you said? Yes. But it appears that on remand the panel reinstated the opinion affirming in all respects the district court's grant of summary judgment for the city of Reno on municipal liability. Were you aware of that? No, because I believe that the last I read was Judge Kaczynski's decision about or opinion in the en banc hearing. Well, maybe all of us should look into that and see what the status is. I believe the facts in that case are a lot more egregious given and gave a more immediate and imminent danger of suicide to all those involved. I want to just state also and perhaps that the plaintiffs have also raised the issue of the state law claims, and it's clear from the record that the plaintiffs have always considered any state law claim to be a survivor claim in their motion for summary judgment briefing at S.E.R. 218 in response to the motion for summary judgment. Give me that citation again. S.E.R. what? S.E.R. 218. Okay. Thank you. Go ahead. The header on the plaintiff's motion for summary judgment says, defendants assert a valid survival claim. That was in response to our motion to dismiss the state law claims. If we were to reverse on any other grounds, presumably there would be an opportunity to amend to state other claims, one would think. Well, I'm not sure at this late date, but also the court, because they found that there was no state law claim, the court did not even go into all the Idaho Tort Claims Act immunities and defenses that would apply as well. So those were not necessary to be considered at that stage of the proceeding. If there are no other questions, I would request that the court affirm. Thank you. Thank you, counsel. You have some rebuttal time remaining. Thank you, Your Honor. First, this case is more like Kahn than Simmons and Clothier, and Kahn is still good law on the individual liability claims. That's a 2011 opinion. I can get the citation if you want it, reinstating that opinion. Second, there can be municipal liability without individual liability. I think it's the Fairley case in which the court, reviewing after a trial decision, said it doesn't matter if the individuals are exonerated. If the jury found municipal liability, that doesn't undermine the municipal liability ruling. With respect to the state law claims, our complaint plainly does allege a wrongful death claim. The trial court and defendants acknowledged that we had in prior litigation our motion to dismiss, and this was never raised at the summary judgment stage, whether or not we had alleged a wrongful death claim. The trial court simply confused the distinction between a wrongful death claim and a survival claim. It's just a short sentence in the opinion. Now, what's your response to Mr. Naylor's statement that there's nothing in the record that the county ever received the Rocky Mountain report? Your Honor, this is quite a story. This document wasn't produced to us when we asked for it. About 13 months passed, and they gave it to us on the eve of the 30B6 deposition of Rocky Mountain. But he says it was never in the county records. They got it from Rocky Mountain. Well, we never had enough. The question is, is there anything, you know, I don't care about that. What I want to know is, is there anything in the record to show that the county had seen this report, you know, before the time of this incident? Given the unusual circumstances, there's enough in the record to draw a reasonable inference that the county received this document. What is that evidence that would allow such an inference? Well, they produced it to us in discovery. They don't dispute the contents of it. Did the 30B6 designee of Rocky Mountain Corrections testify that the contents are accurate, that the Rocky Mountain Corrections produced this report and provided it to them? Okay, that's the key. Did they testify that they had produced this to the county at the time or between 2006 and 2008? I believe that they did. I don't have a record citation off the top of my head. Is that otherwise, if they prepare a report and stick it in their own file, it doesn't provide the sort of intentional act on the part of the county that you're alleging and that you have to allege. Let me ask a related question. Is there anything in the record that shows why this report was prepared? In other words, somebody requested it be prepared? The county requested it. The sheriff at the time requested that they come. In the record that shows that the sheriff of Caribou County requested Rocky Mountain to prepare this report? Yes, Your Honor. Where is that? Is that part of the report itself? I believe that it states that in the report that we're here at your request, also in the 30B6 deposition of Rocky Mountain Corrections. That is discussed. Now, I want to say one more thing on that. This was given to us on the eve of the close of discovery. By who? We didn't have the opportunity to ask the sheriff, did you get this document? Because he had already been deposed when we got it. So it seems fundamentally unfair that they can now say, hey, there's no evidence in the record on this. We got it when discovery was almost closed when we had taken virtually every deposition that we took in the case. Did you get it from the county? We did. We did. So to finish up, the fundamental flaw in the trial court's ruling is that it conflicts with the summary judgment standard. You can't conclude that that fax outweighs the banister's evidence without improperly weighing the evidence. The banisters are entitled to a jury trial, both on the municipal liability claims, the individual liability claims, and the state law wrongful death claims. Thank you, Your Honor. Thank you, counsel. We appreciate the helpful arguments of both counsel in this case, and it is submitted. We'll take about a ten-minute break.
judges: Tashima, Graber, Murguia